**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MANDAN, HIDATSA AND ARIKARA NATION | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. __18-1462_____ |
| THE UNITED STATES DEPARTMENT OF THE INTERIOR, RYAN ZINKE, in his official capacity as Secretary of the Interior | ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

Plaintiff, Mandan, Hidatsa, and Arikara Nation, the Three Affiliated Tribes of the Fort Berthold Indian Reservation ("MHA Nation" or "Tribe"), by and through its attorneys hereby states and, alleges as follows:

## I.     NATURE OF THE ACTION

1.     This action is brought by an Indian Tribe with a governing body duly recognized by the United States through the Secretary of the Interior and seeks declaratory relief from the unlawful decision of the Director of the Department of Interior's Office of Hearing and Appeals (OHA) issued on March 22, 2018, invalidating a stay order issued by the Interior Board of Land Appeals (Board) and approving eight Applications for Permit to Drill (APDs) near Lake Sakakawea within the boundaries of the Fort Berthold Indian Reservation.  (See Exhibit A).

2.     This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. ("APA").  The APA provides for judicial review of final agency actions and provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions"

found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

3.      The OHA Director's Decision is a final appealable order under the APA.

## II.      THE PARTIES

4.      Plaintiff MHA Nation is a federally recognized Indian Tribe with a Constitution approved by the Secretary of Interior pursuant to Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 746. 81 Fed. Reg. 5019, 5023 (January 29, 2016).

5.      Defendant United States Department of the Interior ("DOI") is a federal agency of the United States of America.  The DOI is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, and express and implied contracts.

6.      Defendant Ryan Zinke is the Secretary of the Interior.  As Secretary, Ryan Zinke is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, and express and implied contracts.

7.      As Secretary, Ryan Zinke is ultimately responsible for the OHA Director's Decision.  The OHA Director merely exercises authority delegated by the Secretary pursuant to 43 C.F.R. § 4.5 (b).

8.      The Department of the Interior and Ryan Zinke are collectively referred to herein as "Defendants" or "Federal Defendants."

## III.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over this suit under 5 U.S.C. § 702 and 704 (APA jurisdiction to review agency actions); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1362 (federal question brought in a suit by an Indian Tribe).

2

10.     Venue is appropriate in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States. Defendant DOI is an agency of the United States and has its offices in Washington, D.C. Defendant Zinke is an officer of the United States who performs his official duties in Washington, D.C.

## IV.     STATEMENT OF FACTS

11.     The MHA Nation resides on the Fort Berthold Indian Reservation in west-central North Dakota.  The MHA Nation's tribal government oversees its Reservation and membership of more than 15,000 individual members.

12.     The Fort Berthold Indian Reservation includes an area of about 1,530 square miles or 980,000 acres.  The United States holds title to approximately 455,000 acres of land within the exterior boundaries of the Fort Berthold Indian Reservation in trust for MHA Nation and its members.

13.     The Fort Berthold Indian Reservation is located in the heart of the Williston Basin, which contains the oil-rich Bakken and Three Forks formations.  More than one third of North Dakota's oil reserves are within the Reservation, and the oil and gas wells on the Reservation account for roughly twenty percent (20%) of North Dakota's daily oil production.

14.     The MHA Nation is organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq*. (IRA).  The Secretary of the Interior approved the Constitution and Bylaws of the MHA Nation on June 29, 1936, under Section 16 of the IRA.

15.     Under Article I of its federally approved IRA Constitution, The MHA Nation occupies and exercises jurisdiction "to all persons and all lands, *including lands held in fee*, within the exterior boundaries of the Fort Berthold Reservation."  The MHA Nation also exercises powers

of self-governance within those lands, including the provision of essential governmental services such as law enforcement, social services, a judicial system, a housing program, an elders program, environmental monitoring, cultural resources protection, and health services.

16.     Article VI § 3 empowers the MHA Nation's governing body, the Tribal Business Council, with "all necessary sovereign authority - legislative and judicial - for the purpose of exercising the jurisdiction granted ... in Article I of this Constitution."

17.     Article VI § 5 (j) also provides the MHA Nation's governing body with authority over "natural resources" which includes water resources.

18.     In 1947, the Army Corps of Engineers ("Army Corps") began construction on the Garrison Dam on the Fort Berthold Indian Reservation under the authority of the Flood Control Act of 1944, P.L. 78-534, 56 Stat. 887.  The Garrison Dam is one of six dams built and operated by the Army Corps on the Missouri River's Main Stem under the Pick Sloan Program.

19.     Completed in 1953, the construction of the Garrison Dam resulted in the taking of more than 152,360 acres of the MHA Nation's land, the forced relocation of numerous tribal communities, and the loss of approximately ninety five percent of the Reservation's productive agricultural lands.  The water impounded by the Garrison Dam created a large reservoir called Lake Sakakawea which runs through the heart of the Fort Berthold Indian Reservation.

20.     Lake Sakakawea provides a critical source of tribal and public waters, as well as natural, cultural, and recreational resources.  The Lake is the primary source of the MHA Nation's drinking water, and is also part of the Missouri River, which provides drinking water to millions of individuals downstream from the Tribe's Reservation.

21.     The waters of Lake Sakakawea and the Missouri River are at the heart of the MHA Nation's religious and cultural identity and are relied on for the MHA Nation's sustenance and economic livelihood.

## A. TRIBAL AND FEDERAL SETBACKS FOR OIL AND GAS DEVELOPMENT NEAR LAKE SAKAKAWEA

22.     In August 2012, the MHA Nation enacted a law which required setback to protect its drinking waters and natural and cultural resources. That law, adopted via Resolution No. 12-087-VJB, required well sites to be setback at least one half mile from the Missouri and Little Missouri River. The Resolution also designated certain areas as sacred sites to be protected from excessive development.

23.     By resolution No. 12-139-VJB, adopted in December 2012, the MHA Nation amended its setback law to provide a process for obtaining a tribal variance from the half-mile setback requirements and to clarify that the Missouri and Little Missouri River includes Lake Sakakawea.

24.     In February 2017, the MHA Nation enacted Resolution No. 17-038-FWF amending the Tribe's setback law, and making tribal law consistent with current federal standards. The February 2017 amendment continued to allow for variances from the one half-mile setback established in Resolution No. 2-087-VJB, but it also statutorily mandated that the minimum setback from Lake Sakakawea was 1,000 feet.

25.     In adopting its setback laws, the Tribe's legislative body determined that the setback laws are supported by and based upon the legislative power and duty to protect the MHA Nation, its Reservation and waters, members and residents of the Reservation from the specific threat of oil and gas activity near Lake Sakakawea

Case 1:18-cv-01462   Document 1   Filed 06/20/18   Page 6 of 26

26.     The legislature's action was based upon its power and duty to protect the health and welfare of the Tribe and its members.

27.     The legislature's action was further based upon its power and duty to protect the Tribe's land and waters.

28.     In 1988, the Bureau of Land Management ("BLM") implemented its North Dakota Resource Management Plan ("RMP") applicable to the development of all federal minerals within North Dakota.

29.     BLM's RMP requires that leases for actions within 1,000 feet from large streams, rivers, and domestic water supplies, such as Lake Sakakawea, must be strictly controlled or excluded all together.

30.     The RMP provision for strict control or prohibition, described above, applies to the development of federal minerals and the federal actions at issue in this case.

31.     For the federal actions at issue, the RMP also requires cooperative management of federal lands and minerals and the evaluation of the RMP's consistency with approved management plans of other federal agencies and Indian Tribes such as the MHA Nation.

32.     For the federal actions at issue, the RMP additionally requires BLM protect the cultural resources by coordinating with Indian Tribes when BLM actions related to the development of federal minerals have the potential to disturb sacred areas or sites, such as Lake Sakakawea and the Missouri River.

33.     In December 2013, the Army Corps issued its *Garrison Project-Lake Sakakawea Oil and Gas Management Plan* ("Army Corps Plan") to address the impacts oil and gas exploration, development, and production projects have on the surface and subsurface estates of the Garrison Project.

34.     The Army Corps Plan applies to federal, state, and private minerals; and applies to the federal actions at issue in this matter.

35.     The Army Corps Plan sets forth special areas where surface use or occupancy is strictly controlled or prohibited.  One of the special areas contained in the Army Corps Plan is areas within .25 miles (1,320 feet) of surface water or riparian areas, such as Lake Sakakawea.  In these areas, the Army Corps Plan allows for a waiver or modification of this limitation which can only be granted through approval in writing from the Army Corps' Authorized Officer.

36.     The federal action at issue required written approval from the Army Corps' Authorized Officer under the process set forth in the preceding paragraph.

37.     In May 2014, the Bureau of Indian Affairs ("BIA") prepared a Programmatic Biological Assessment and Biological Evaluation for Fort Berthold Indian Reservation Oil and Gas Development (Programmatic BA/BE) for concurrence by the Fish and Wildlife Service ("FWS") to comply with the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, ("ESA") for oil and gas development on the Fort Berthold Indian Reservation.

38.     The Programmatic BA/BE establishes a minimum 1,000-foot setback as both a general and specific requirement for oil and gas development around Lake Sakakawea.  The Programmatic BA/BE and its 1,000-foot setback covers oil and gas development for the five year period from 2014 to 2019 and explicitly applies to all land within Fort Berthold Indian Reservation, including fee land.

39.     On June 4, 2014, FWS concurred with BIA's findings and conditions in the Programmatic BA/BE, including a conclusion that the 1,000-foot setback from Lake Sakakawea was necessary to protect Lake Sakakawea from a potential oil and gas spill.

40.     The federal action at issue violates the 1,000-foot setback provision of the Programmatic BA/BE.

**B.      SLAWSON EXPLORATION COMPANY'S TORPEDO PROJECT**

41.     On May 31, 2011 and August 2, 2011, Slawson Exploration Company ("Slawson") submitted APDs for six wells to BLM's North Dakota Field Office.  On June 2, 2015, Slawson submitted APDs for an additional two wells to the North Dakota Field Office.  Collectively, these eight wells comprise what is referred to as the Torpedo Project ("Project").

42.     The Project is on fee lands within the exterior boundaries of the MHA Nation's Fort Berthold Indian Reservation within the State of North Dakota.  The Project is located on the southern end of a peninsula that extends into the Van Hook Arm of Lake Sakakawea.

43.     The Project is being constructed a mere 600 feet from Lake Sakakawea.

44.     The Project threatens tribal and public waters as well as natural and recreational resources of Lake Sakakawea.

45.     Slawson selected this shoreline location specifically to reach federal minerals leased by Slawson underneath Lake Sakakawea.   The minerals leased by Slawson are approximately two to three miles from its shoreline well pad.  This distance, two to three miles, is the typical distance for current hydraulic directional drilling technologies to successfully develop oil and gas resources.

46.     The Project would be an industrial site including a well pad and access road for the drilling of eight oil and gas wells underneath the Lake.  The site would include oil drilling, pumping, supporting infrastructure and facilities, truck traffic, and the construction of a one mile-long steel pipeline that will move produced oil and water to an existing 5-acre site hosting tank batteries.  The Project would occupy and disturb roughly 25.47 acres.

47.     If the proposed oil and gas wells are economically feasible for commercial production, the leases permit Slawson to conduct further exploration of surrounding areas and construct additional facilities associated with the wells, including a pipeline to gather and carry their produced oil and water.

48.     After Slawson submitted its APDs for the Project, BLM held a thirty-day public scoping period from November 9 to December 9, 2015.  BLM then prepared a Draft Environmental Assessment ("EA"), solicited public comment, and issued its final EA in March 2017.

49.     On March 10, 2017, BLM's North Dakota Field Office issued its Decision Record and Finding of No Significant Impact ("DR/FONSI") approving Slawson's eight associated APDs. BLM failed to apply the Tribe's 1,000-foot setback in its DR/FONSI based on a determination that it was not obligated to consider tribal law based on the Project's location on an inholding of fee land within the exterior boundaries of the Fort Berthold Indian Reservation.

### C.     ADMINISTRATIVE APPEALS

50.     The MHA Nation sought administrative review of the decision by filing a request for BLM State Director Review on April 10, 2017.  The Tribe's request objected to the location of the well pad as a clear violation of tribal law and conflicting with the BLM's RMP and the setback requirements of the BIA, FWS, and Army Corps.

51.     The Acting State Director of the BLM Montana State Office denied the MHA Nation's request for stay and affirmed the Field Office's DR/FONSI authorizing the Project on April 24, 2017.  The State Director's decision was based on a finding that BLM was not bound, and thus need not consider, any of the four distinct 1,000-foot setback requirements for oil and gas activity near Lake Sakakawea.

52.     On May 24, 2017, the MHA Nation timely filed an appeal and petition for stay of the Acting State Director's decision with the Interior Board of Land Appeals ("Board") pursuant to 43 C.F.R. §§ 3165.4(a) and (c) and 43 C.F.R. Part 4.  Slawson subsequently intervened in the appeal and filed a brief responding to the MHA Nation's request.  Briefing on MHA Nation's petition for stay was completed on June 5, 2017.

53.     On August 9, 2017, the Board issued an order staying the State Director's decision and its approval of the BLM Field Office's DR/FONSI until the appeal proceedings before the Board were completed.  After an analysis of the standards of a stay petition set forth in 43 C.F.R. § 3165.4(c), the Board granted the MHA Nation's petition based on a determination that the Tribe's appeal raised multiple legal issues of first impression that could only be properly addressed after a thorough review of applicable law and precedent.

**D.     U.S. DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA PROCEEDINGS**

54.     On August 11, 2017, following the Board's entry of the stay and while briefing of the matter before the Board was ongoing, and prior to any final agency action, Slawson filed a complaint in United States District Court for the District of North Dakota requesting declaratory and injunctive relief from the Board's stay order under the APA, 5 U.S.C. § 706.

55.     The next day Slawson filed a motion for a temporary restraining order ("TRO") and preliminary injunction with the court seeking to enjoin enforcement of the Board's temporary stay order.  Slawson's motion claimed its ongoing oil and gas activities at the Project were harmed by the Board's stay even though Slawson had been provided full notice of the stay, participated in briefing on the stay and was advised by the Board on July 21, 2017 that the Tribe's request for stay was still pending.

56.    The court granted the TRO against the Board's stay order on August 15, 2017, allowing Slawson to resume drilling 600 feet from Lake Sakakawea.  The TRO was issued *ex parte* without briefing or hearing from any other party in this case.  In its order, the court set a hearing for a preliminary injunction on August 29, 2017.

57.    Slawson had intentionally not named the Tribe as a party to that suit, and the court did not require notice to the Tribe prior to consideration and issuance of the TRO.

58.    While this decision was strictly temporary, on August 21, 2017, BLM filed for a motion seeking an extension of the TRO and a stay of the court proceedings.  The motion requested a more than two-month extension of the TRO until October 31, 2017.  BLM filed this motion without consulting with the MHA Nation, its trustee.  BLM's petition also requested that the court stay the proceedings before them until further order by the court, allowing the administrative process before the Board to proceed.  The court approved BLM's motion the same day.

59.    On September 25, 2017, the MHA Nation filed a motion to intervene in the district court action which was granted on October 11, 2017.

60.    On October 12, 2017, the MHA Nation filed a motion to dismiss Slawson's complaint and dissolve the TRO based on lack of final agency action and Slawson's failure to exhaust the available administrative remedies.  On November 27, 2017, the court issued an order denying the MHA Nation's motion to dismiss and granting Slawson's request for preliminary injunction.

61.    The federal court action was subsequently dismissed and all orders mooted.

**E.    OHA DIRECTOR REVIEW**

62.    On October 2, 2017, BLM filed a Petition for Director's Review in the ongoing administrative proceedings before the Board, requesting the Director of the United States'

Department of Interior Office of Hearing and Appeals ("OHA") review and invalidate the Board's stay order, take jurisdiction over the administrative appeal, and render a final decision on the matter.  On October 10, 2017, Slawson also filed its own request for OHA Director Review under 43 C.F.R. § 4.5(b) which sought the same action as BLM's Petition.

63.     Without providing the Tribe with notice and an opportunity to be heard, and despite more than twenty years of precedent limiting the use of the Director's sparingly used review authority to extraordinary circumstances or errors, the Director granted the BLM's Petition and Slawson's request, assumed jurisdiction of the case, and directed the parties to submit a proposed briefing schedule on October 13, 2017.

64.     On October 17, 2017, the MHA Nation requested reconsideration of the Directors' assumption of jurisdiction on this case based on its inability to respond to BLM and Slawson's initial petitions for Director review and Departmental regulations at 43 C.F.R. §4.28 prohibiting review of interlocutory appeals of rulings like the temporary stay order issued by the Board.

65.     On March 22, 2018, the Director issued a Decision in the appeal which found the Board's stay order was in error, affirmed the BLM's DR/FONSI approving the APDs, and denied the MHA Nation's request for reconsideration.

66.     The Director's Decision found the Board's stay order invalid based solely on a disagreement with the Board's application of Board precedent and determination that the appeal raised multiple legal issues of first impression that could only be properly addressed after a thorough review of applicable law and precedent warranted a stay.  The Director took this position despite acknowledging that the stay related filings contained challenging components and complex legal issues that are not regularly before the Board, the Project contained unique technical

complexity, and that an Intervener's participation places additional information, arguments, and thus considerations before the Board.

67.     The Director's Decision went on to discuss at length issues outside the merits of the appeal, such as the Director's perception that the Board did not adequately consult legal authority from a different OHA appeals board and the Director's administrative complaints regarding the timing of the issuance of the Board's stay order, even though the stay order was properly issued according to long-standing precedent of the OHA Director.

68.     In contrast to the considerable discussion on these non-merit issues, in affirming the BLM Field Office's DR/FONSI the Director's Decision failed to substantively address or analyze any of the merits of the MHA Nation's appeal.  Instead, the Decision simply cites to the district court's November 27, 2017 order granting a preliminary injunction of the Board's stay order to support its affirmance of the DR/FONSI.  The Director's Decision offered no support for its reliance on the District Court's interlocutory order in affirming the BLMs DR/FONSI and allowing Slawson to continue construction and operation of its oil and gas wells outside of the Director's belief that the issue before the court overlapped with those in the MHA Nation's appeal.

## V.     CAUSES OF ACTION

### Violation of the APA, 5 U.S.C. § 706

69.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

70.     The APA requires courts to "set side agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

71.     In invalidating the Board's stay order and holding that BLM complied with all applicable authorities governing its decision-making process, the Director entirely failed to address the standards for issuance of a stay and the substantial arguments before the Board and the OHA, adequately consider or apply the DOI's treaty obligations and trust responsibility to the MHA Nation, the federally approved Constitution and Bylaws of the MHA Nation, the MHA Nation's regulatory jurisdiction over activities on fee land within the Reservation that are necessary to protect the health and welfare of its members under *Montana v. United States,* 450 U.S. 544, 565-66 (1981), or the application of the Lake setback requirements contained in various federal agencies' policies and resource development plans.

72.     The BLM was required to apply the MHA Nation's setback law to the Project, and under that law, it was required to deny all eight of the APDs.  *E.g., Montana v. United States EPA*, 137 F.3d 1135, 1139 (9th Cir. 1998).  BLM's duty to apply the MHA Nation's law was required for multiple reasons, including that the law was validly enacted under proper tribal constitutional authority that had been approved by the Secretary of the Interior; that any claim that the tribal law was not valid would present an issue of tribal law which can only be brought in the Tribe's judicial or administrative fora; that the United States has a trust duty and a treaty duty to apply and enforce the Tribe's laws unless the Tribe, through its final judicial forum has held that the tribal law is invalid, and that Slawson has not exhausted tribal remedies.

73.     For the foregoing reasons, the Director's March 22, 2018 Decision is arbitrary and capricious, abuse of discretion and not in accordance with law in violation of the APA and must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

14

## VI.     PRAYER FOR RELIEF

WHEREFORE, THE MANDAN, HIDATSA, AND ARIKARA NATION REQUESTS:

1.     An order setting aside and vacating the Director's Decision and holding that the eight APDs must be denied because they are within 1,000 feet of Lake Sakakawea the source of the MHA Nation's drinking water; or in the alternative reinstituting the Board's stay order and remanding the case back to the Department of the Interior for reconsideration.

2.     An order awarding costs, fees and attorney fees to the extent permitted by law.

3.     Such other and further relief as the Court shall deem appropriate.

Dated: June 20, 2018.

FREDERICKS PEEBLES & MORGAN LLP

_s/   Rollie E. Wilson_____
Rollie E. Wilson (D.C. Bar No. 1008022)
401 9th Street, N.W., Suite 700
Washington, DC 20004
Telephone: (202) 450-4887
Email: rwilson@ndnlaw.com

_Attorney for Plaintiff_

## EXHIBIT A

*Mandan, Hidatsa and Arikara Nation v. The United States Department of the Interior; Ryan Zinke, in his official capacity as Secretary of the Interior*
Case No. _____



# United States Department of the Interior

## OFFICE OF HEARINGS AND APPEALS

Office of the Director
801 N. Quincy Street, Suite 300
Arlington, Virginia 22203
Telephone (703) 235-3810   Facsimile (703) 235-9014

March 22, 2018

| | | |
|---|---|---|
| IN THE MATTER OF | ) | Docket No. DIR-2018-0001 |
| | ) | (IBLA No. 2017-211) |
| MANDAN, HIDATSA AND | ) | |
| ARIKARA NATION | ) | Director's Assumption of Jurisdiction |
| | ) | |
| | ) | BLM Decision SDR-922-17-06 Affirmed |

     I have exercised my delegated, discretionary authority[1] by assuming jurisdiction over *Mandan, Hidatsa and Arikara Nation v. Bureau of Land Management*.[2] Before I took such action, the Interior Board of Land Appeals granted the MHA Nation's petition for a stay of a BLM decision to approve Applications for Permits to Drill (APD).[3] The IBLA Stay Order was, undisputedly, not issued until the BLM decision had become effective.[4] It prompted not only petitions to me,[5] but also led the Slawson Exploration Company, the permit applicant, to seek relief in Federal court.[6] As shown below, I have determined that the Stay Order was decided in error, strongly disapprove of the Stay Order's untimeliness, and affirm the BLM decision on the merits.

## *I. The Stay Order Was In Error*

     To obtain from the IBLA a stay of an agency decision, a stay petitioner has the burden of proof on each of the four stay standards.[7] Here, the single-judge IBLA Stay Order made a passing reference to the MHA Nation's burden,[8] and followed with a block quotation of a 2016 IBLA decision, *Pueblo of San Felipe*, in which the IBLA explained that

---

[1] 43 C.F.R. § 4.5(b); *In re Fina Oil & Chem. Co.*, 19 OHA 200, 202 (2001).

[2] *See* Notice and Briefing Schedule Order (Oct. 13, 2017) (Attachment 1).

[3] IBLA Order No. 2017-0211 (Aug. 9, 2017) (Stay Order) (Attachment 2) at 1.

[4] 43 C.F.R. §§ 4.21(a)(3); (b)(4).

[5] BLM's Petition for Director's Review and Brief in Support (Oct. 2, 2017); Slawson's Request for Director Review Under 43 C.F.R. § 4.5(b) (Oct. 10, 2017) (Slawson's Request for Director Review); 43 C.F.R. § 4.5(b).

[6] The Federal court proceeding's docket is accessible via the United States Courts Public Access to Court Electronic Records (Case No. 1:17-cv-00166).

[7] 43 C.F.R. § 4.21(b)(1)-(2).

[8] Stay Order at 1.

stay petition reviews are "preliminary in nature and necessarily more cursory than [what] a full review" of a case's merits would entail.[9]  The IBLA Judge also quoted *San Felipe* for the principle that the IBLA has the discretion to grant a stay where it appears that further briefing or "subsequent events" may change the Board's analysis and conclusions of law.[10]  Despite the IBLA Judge's emphasis on *San Felipe*, he erred in applying it and, in turn, improperly applied the overarching regulatory stay burden. Specifically, the IBLA Judge failed to establish that this case involves a situation in which, upon the stay-level briefing's completion, "additional arguments presented [would have] alter[ed] the Board's view of the evidence."[11]

### A.  Erroneous Application of San Felipe

At the crux of the stay petition was the MHA Nation's objection to the project's location.  The project's location is within the "exterior boundaries" of the MHA Nation's Reservation, and, as MHA asserts, 600 feet from an engineered lake that provides the MHA Nation's drinking water and is connected to the Missouri River, which has cultural significance to the MHA Nation.[12]  The MHA Nation argued that the location "does not comply with numerous tribal and federal laws, regulations and management plans requiring" that the project be set back from the lake by 1,000 feet, and asserted that "a thorough hearing of [the] setback requirements" was necessary.[13]  In the stay petition, the MHA Nation implicated the project location in each of the four stay standards' discussion.[14]

I have reviewed the stay-level pleadings and determined that they are objectively comprehensive and informative as to the MHA Nation's setback arguments.  The IBLA Judge had before him not only the stay petition, but also two responsive opposition briefs (separately filed by both BLM and Slawson).  Not only does the stay petition constitute twenty pages of legal analysis containing numerous arguments, but the MHA Nation provided twelve exhibits, many of which are voluminous and factually-intensive, and others of which contain detailed, in-depth legal analysis on issues presented in the petition.  Similarly thorough are the two responses to the stay petition.  BLM's response addresses each of the MHA Nation's main legal arguments, and is supported by numerous exhibits, including the Decision Record, the Environmental Assessment, and

---

[9] *Id.* at 6 (quoting *Pueblo of San Felipe*, 187 IBLA 342, 345 (2016)).

[10] Stay Order at 6.

[11] *San Felipe*, 187 IBLA at 345.

[12] Notice of Appeal and Petition for Stay (May 24, 2017) (Stay Petition) at 2-3.

[13] *Id.* at 3.

[14] *See, e.g., id.* at 4, 8, 18, 19.

other materials required by statute as part of BLM's planning process.[15] And Slawson's response also includes both a thorough legal discussion of the issues presented by the MHA Nation, as well as demonstrative exhibits.[16]

The IBLA Judge referenced the opposition briefs but neither expressed any concern that they contained factual or analytical shortcomings that would or should be filled in subsequent filings, nor identified any forthcoming or scheduled events that, even theoretically, would have had the potential to alter scenarios relevant to the appeal.[17] Such omissions are particularly conspicuous given the IBLA Judge's decision to frame his stay analysis around *San Felipe* and conclude that this case was one in which "additional arguments" and "further . . . evidence" could alter the outcome of the decision made at the stay level.[18] I disagree with the IBLA Judge's apparent belief that any arguments, evidence, or other information absent from the stay-related filings could possibly have had so much of an impact on the IBLA's merits decision that granting the stay was warranted.[19] Therefore, *San Felipe* alone provides no reason for granting the Stay Order, and the IBLA Judge erred by relying on it in such a manner. I do not intend to either overrule *San Felipe* or instruct the IBLA to avoid applying its principles in future cases. Rather, I write here to document what I view to be the IBLA Judge's erroneous application of *San Felipe* in this case.

The IBLA Judge's application of *San Felipe* goes beyond harmless error because it caused the entire stay analysis to be called into doubt. The IBLA Judge concluded that the MHA Nation met the "likelihood of the appellant's success on the merits" standard[20] upon determining that the MHA Nation's reference to a "1,000[-]foot setback [requirement] established by Tribal Law" constituted "'a reasonable basis for challenging'" the BLM decision, "'raise[d] material concerns that can only be comprehensively addressed after more thorough review. . . ,'"[21] and presented "multiple legal issues of first impression that can only be comprehensively and properly addressed after a thorough review of applicable law."[22] But the opposition filings squarely address the setback requirement referenced by the IBLA Judge, and convincingly demonstrate

---

[15] *See, e.g.,* BLM's Response in Opposition to MHA Nation's Petition for Stay (June 6, 2017) (BLM's Stay Opposition) at 5.

[16] 43 C.F.R. § 4.21(b)(1)(i); Slawson's Response to Petition for Stay (Slawson's Stay Response) (June 5, 2017).

[17] *See, e.g.,* Stay Order at 7-9.

[18] *San Felipe,* 187 IBLA at 345.

[19] Stay Order at 9-10.

[20] 43 C.F.R. § 4.21(b)(1)(ii).

[21] Stay Order at 8 (quoting *San Felipe,* 187 IBLA at 346).

[22] Stay Order at 10.

that the requirement does not apply.  For example, the IBLA Judge concluded that BLM "disregard[ed] . . . Tribal Law" and "claim[ed that] it need not abide by the . . . setback."[23]  But BLM had stated that despite BLM's "trust obligation to protect trust resources within the Reservation boundaries," it "does not have to enforce [the setback requirement] . . . because the lands and minerals at issue in this case are both in fee.  Tribal law is not applicable . . . in this circumstance."[24]  Similarly, Slawson pointed out key flaws in the stay petition.  The MHA Nation argued that under *Montana v. United States*, a tribe may regulate "'the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'"[25]  In response, Slawson showed that the MHA Nation failed to establish that *Montana* applies here because *Montana* did not involve a Tribe's assertion of civil jurisdiction over a Federal decision.[26]  Slawson also contended that even if *Montana* does apply here, the MHA Nation has not demonstrated "that the Project will imperil its subsistence or result in catastrophic consequences,"[27] as required to meet an exception to the general rule that Tribes do not exercise civil jurisdiction over non-Tribal members.  Consequently, set forth for the IBLA Judge was the setback requirement's threshold inapplicability and the related prospect that the MHA Nation had not met its burden of showing a likelihood of success on the merits.

It is not to say that the stay-related filings involved simple, easily-resolvable legal matters.  Indeed, *Montana* and related case law involve legal issues that do not regularly arise on the IBLA's docket.  The project entails technical complexity, and BLM's approval process was subject to the National Environmental Policy Act of 1969 and required concurrence from the Fish and Wildlife Service.  The project also required BLM to consider the potential applicability of its North Dakota Resource Management Plan and other agency authorities, such as a Bureau of Indian Affairs Programmatic Biological Assessment and Biological Evaluation, and an Army Corps of Engineers Oil and Gas Management Plan.  And as a practical matter, an intervenor's participation in this case required the IBLA Judge to review additional information and arguments.  Despite the matter's challenging components, my decision remains.

---

[23] *Id.* at 9.

[24] BLM's Stay Opposition at 5.

[25] Stay Petition at 10 (*quoting Montana*, 450 U.S. 544, 566 (1981)).

[26] Slawson's Stay Response at 13-15.

[27] *Id.* at 15-16 (citing *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 341 (2008)).

### B. Future Expectations for Considering All OHA Boards' Authority

I assumed jurisdiction over this matter also to express concern with what I perceive to be the IBLA Judge's particular failure to appropriately consult, research, and analyze legal authority established by the Interior Board of Indian Appeals, another OHA appeals board. As stated above, the MHA Nation's stay petition involved questions relating to a Tribal organization's jurisdictional authority over BLM's approval of APDs on fee land within a reservation's boundaries, and the scope of the Department's obligation to protect Indian trust resources in a decision-making process. The IBLA Judge identified these questions, yet the Stay Order's citation to legal authority on these issues was merely topical. For example, the IBLA Judge's citation to a 1982 IBIA decision[28] amounted to recitation of basic facts about the Indian Reorganization Act of 1934, namely that the Act governs the United States' relations with Indian tribes and establishes a trust responsibility having each of the "'necessary elements of a common law trust.'"[29] Neither here nor elsewhere in the Stay Order is there an indication that the IBLA Judge considered whether the IBIA has opined on the more specific jurisdictional questions that the stay-level filings presented for his review. In fact, before me, Slawson has demonstrated that the IBLA Judge failed to notice that in *St. Pierre*—the very case that the IBLA Judge quoted—the IBIA established that a tribe's authority and power based on its own Constitution covers only "internal or domestic concern[s]," and cannot be used to limit or restrict the action of the United States as a trustee.[30] Slawson also provided IBIA authority for the proposition that, in matters beyond the scope of a tribe's jurisdiction, it is entirely possible for an agency to meet its trust obligations in the course of reaching an agency decision, even over a tribe's objection or assertion that it conflicts with tribal law or a tribal court order.[31] In contrast, the IBLA Judge stated that "this appeal raises multiple legal issues of first impression."[32]

The MHA Nation takes issue with Slawson's IBIA case law discussion,[33] yet I need not opine on the accuracy of Slawson's particular representation to find that it demonstrates the IBLA Judge's failure to determine whether IBIA authority would have helped the IBLA rule on the stay petition. To the IBLA Judge's credit, in the stay-level pleadings, none of the parties specifically discussed whether IBIA law applied. Thus, the Stay Order's citation to *St. Pierre* shows that the IBLA Judge did independently research IBIA precedent. As shown above, however, such research lacked the depth and thoroughness necessary to have properly provided a basis for granting the stay.

---

[28] *Roger St. Pierre v. Commissioner of Indian Affairs*, 9 IBIA 203 (1982).

[29] Stay Order at 3 (quoting *St. Pierre*, 9 IBIA at 234).

[30] Slawson's Request for Director Review at 10 (quoting *St. Pierre*, 9 IBIA at 245).

[31] Slawson's Request for Director Review at 10-11 (citing IBIA case law).

[32] Stay Order at 10.

[33] MHA Nation Joint Reply to BLM and Slawson Answers (Dec. 12, 2017) at 21-22.

I find that if the IBLA Judge intended to grant the stay because he conducted independent research of IBIA law and determined that subsequent briefing was necessary on such authority, then it was incumbent on him to identify those legal issues with more accuracy and particularity than what appears in the Stay Order, and to show that it was not possible to decide the issues based on what was before him. In the alternative, the IBLA Judge could have determined that IBIA authority was determinative on the jurisdictional questions at issue, and presented that analysis and conclusion in the Stay Order. As shown above, however, the IBLA Judge took neither of these measures.

In future instances, I am establishing the expectation that all OHA appeals boards—the IBLA, the IBIA, and ad hoc boards of appeals[34]—be responsible for considering whether authority from another appeals board might apply in a matter before it, and to include an appropriate analysis of such authority. This direction applies in all cases, namely in the course of issuing published decisions and dispositive orders, yet also, as warranted, in the course of issuing stay orders and other non-published, non-dispositive orders.

## II. *The Stay Order's Untimeliness and the Effect of Untimeliness*

I also write to express concern with and disapproval of the Stay Order's untimeliness. My explanation for this position requires some background discussion. As established in OHA's "General Rules Relating to Procedures and Practice," an agency decision becomes effective immediately after an Appeals Board either denies a stay petition or "fails to act" on a stay petition within a specified amount of time: 45 days from the "expiration of the time for filing a notice appeal."[35] At such a time, a decision becomes not only effective, but also "subject to judicial review" under the Administrative Procedure Act.[36]

After the Department's 1993 promulgation of a rule revising the IBLA's stay provisions,[37] a previous OHA Director exercised his review authority in the 1995 decision, *David M. Burton*.[38] The *Burton* Director's decision recognized the new stay provisions by stating, "[t]he primary consequence of IBLA failing to rule upon a stay request within 45 days is that the decision becomes effective. . . . In addition, the

---

[34] 43 C.F.R. § 4.1(b)(1)-(3).

[35] *Id.* at § 4.21(a)(3); (b)(4).  For ease of reference, I will refer to this timeframe as "45 days."

[36] *Id.* at § 4.21(c).

[37] *Final Rule, Department Hearings and Appeals Procedures,* 58 Fed. Reg. 4939, 4942-43 (Jan. 19, 1993).

[38] 11 OHA 117 (1995).

decision becomes subject to judicial review . . . ."[39]  I follow this particular finding here. Yet prompted by the IBLA Judge's decision, as well as this matter's treatment in subsequent Federal court proceedings, I have determined that it is necessary to take up another portion of *Burton*.

In *Burton*, the Director further wrote that the 45-day rule was only intended to ensure a more general need for "stay petitions . . . to receive prompt consideration," and was not designed to prevent the IBLA from exercising an adjudicative body's traditional, inherent authority to grant a stay petition at any time, including after the 45-day period's expiration.[40]  I construe this portion of *Burton* as secondary to the decision's more overarching holding that failing to rule on a stay petition within 45 days makes the underlying decision effective and subjects it to judicial review.  I believe that it is important to read *Burton* with the awareness that it was issued not long after the Department revised the stay provisions.  Prior to the revisions, and dating back to the IBLA's creation, IBLA appeals triggered an automatic suspension of an appealed agency decision.[41]  Thus, the revisions' 45-day rule constituted a significant practice change for the IBLA.  In retrospect, it is understandable that the OHA Director believed it worthwhile to issue a decision that recognized the change, while also underscoring that the change had no effect on the IBLA's ability, or responsibility as an independent adjudication board, to grant a stay regardless of timing, such that it could provide relief that a stay petitioner might convincingly show is necessary, in a case-specific scenario.

Since *Burton*'s issuance, the prospect of the IBLA's authority to issue a late stay—where warranted—has become more solidified as a matter of the Board's practice.  Thus, *Burton* itself is no longer as necessary as it once was to establish or assert a default basis for the IBLA to grant stay petitions at any time.  Recently, the IBLA has taken laudable strides to rule on stay petitions within the 45-day period despite practical demands and associated challenges.  In the context of the Board's overall improvement in this area, the IBLA Judge's Stay Order here represents an outlying step back.  There is no dispute that the August 9, 2017, Stay Order was issued approximately 25 days after the expiration of the 45-day period.  More than amounting to a failure to meet an arguably hortatory or merely "procedural" deadline,[42] the IBLA Judge's late granting of the stay set off a scenario in which BLM had to order Slawson to shut down drilling operations, which had already commenced, and thus subjected the BLM decision to the complications, uncertainty, and delay that can be associated with judicial review.

Indeed, judicial review was sought here.  Soon after the Stay Order's untimely issuance, Slawson filed a complaint with the United States District Court for the District

---

[39] *Id.* at 125.

[40] *Id.*

[41] *Id.* at 119 (quoting 43 C.F.R. § 4.21(a) (1992)).

[42] *Burton*, 11 OHA at 126.

of North Dakota, and sought for the court to set aside the Stay Order. The court awarded such relief via a Temporary Restraining Order (TRO) blocking the United States Government from enforcing the IBLA Stay Order. Thus, while the Stay Order had the consequence of requiring BLM to notify Slawson to shut down the approved drilling operations, the ruling on the TRO meant that Slawson could resume operations. The court later denied a motion to dismiss from the MHA Nation (which had intervened), and continued to enjoin the Stay Order's enforcement via a Preliminary Injunction (PI). In recognition of my assumption of jurisdiction in this matter, the court has stayed the proceedings before it.

Thus, the Stay Order's untimeliness was the seminal occurrence in a string of events that resulted in both a situation in which a Federal court matter is pending simultaneously with my assumption of jurisdiction, as well as continued uncertainty for the permit holder, BLM, and the surrounding community. As a matter of good government, an untimely order granting a stay petition in this context should be avoided at all costs. I am aware that some circumstances will warrant that the IBLA grant a stay after the 45-day period. In such instances, the IBLA can exercise accountability by explaining in the stay order why a post-45-day stay was necessary. Otherwise, neither caseload considerations, nor a case's complexity, provide the IBLA with a basis for failing to meet the 45-day requirement for granting a stay.

### III. The BLM Decision is Affirmed

I have reviewed the filings and BLM's administrative record, and have taken into account each of the MHA Nation's arguments. Based on this review, I find that BLM complied with the various authorities governing its decision-making process, and, in particular, properly determined that the setback requirements cited by the MHA Nation did not serve as a bar to its decision. Thus, I find that the BLM decision has a "rational basis . . . [that is] supported by facts in the record," and that the MHA Nation failed to meet its burden to show "that BLM committed an error of law or a material error in its factual analysis, or that BLM's decision is not supported by a record showing that BLM gave due consideration to all relevant factors and . . . [acted on the basis of] a rational connection between the facts found and the choice made."[43] As a result, I affirm BLM's decision.

My decision to affirm also takes into account, and is bolstered by, the related Federal court order granting the PI.[44] I believe that the subject matter at issue before the court, i.e., the threshold tribal jurisdiction issues, overlaps so substantially with those at issue in the merits portion of the MHA Nation's administrative appeal that the court's PI

---

[43] *Hawkwood Energy Agent Corp.*, 189 IBLA 164, 167-68 (2017).

[44] Order Denying Motion to Dismiss and Granting Preliminary Injunction (Nov. 27, 2017) (PI Order) at 15-16 (enclosed with Slawson's Notice of Ruling in Related Proceedings (Nov. 30, 2017)).

Order serves as instructive guidance for me in reaching a merits decision on the MHA Nation's appeal. In the course of issuing both the TRO and PI, the court stated that Slawson has a "strong likelihood of success on its claims" that it was justified to begin drilling upon receiving BLM's approval of its permit applications, and after the IBLA did not issue a timely order granting the MHA Nation's stay petition. The court also found that Slawson fulfilled the requirement of addressing the "underlying merits" of the case, to the extent that Slawson asserted in its PI brief that the IBLA Stay Order erroneously amounted to allowing the MHA Nation to exercise "tribal regulation [of] non-Indians."[45] Further, the court concluded that it agrees with Slawson's argument that the MHA Nation lacked authority to regulate BLM's decision in this case.[46] Similarly, the court expressly agreed with Slawson's argument that "BLM has no obligation to enforce or recognize tribal law when making federal decisions affecting non-Indian lands."[47]

### IV. The MHA Nation's Request for Reconsideration is Denied

Before concluding, it is necessary to address the MHA Nation's request for reconsideration of my earlier decision to assume jurisdiction of this matter.[48] The request is denied. While OHA's General Rules do not prohibit a party from seeking reconsideration of the Director's assumption of jurisdiction of a matter before an OHA appeals board,[49] the Director's authority to assume jurisdiction is discretionary. Similarly, I find it necessary to correct the MHA Nation's assertion that "the Department's regulations . . . prohibit Director review of the IBLA's Stay Order."[50] The regulations are clear that the Director has the authority to "assume jurisdiction of any case before any [OHA] board."[51]

In this particular instance, the MHA Nation is requesting reconsideration of an interim, procedural order. In that order—in which I announced my decision to assume jurisdiction—I indicated that the MHA Nation would be allowed to file briefs focusing on "both the IBLA Stay Order and merits of the underlying appeal."[52] Despite this, the MHA Nation complained in its reconsideration request that my decision to assume jurisdiction was premature because the MHA Nation had not received an opportunity to respond to

---

[45] PI Order at 16.

[46] *Id.*

[47] *Id.* at 18.

[48] MHA Nation's Request for Reconsideration of Director Review and Assumption of Jurisdiction (Oct. 17, 2017) (Request for Reconsideration).

[49] 43 C.F.R. § 4.21(d).

[50] Request for Reconsideration at 2.

[51] 43 C.F.R. § 4.5(b).

[52] Notice and Briefing Schedule Order at 1.

the initial petitions for me to exercise my review authority.[53]  Having reviewed not only the reconsideration request but also each of the filings submitted since the parties were instructed to file briefs before me, I have determined that the MHA Nation was not prejudiced in the course of the proceedings before me, and reiterate my authority to have assumed jurisdiction.

Based on the foregoing, the IBLA Stay Order is vacated and the BLM decision is affirmed, per my authority.[54]

Shayla Freeman Simmons
Director

---

[53] Request for Reconsideration at 2.

[54] 43 C.F.R. § 4.5(b).